[Cite as *State v. Mosley*, 2020-Ohio-5047.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

STATE OF OHIO

    Appellee

v.

JOSEPH M. MOSLEY

    Appellant

C.A. No.     19AP0016

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.    2017 CRC-I 000484

DECISION AND JOURNAL ENTRY

Dated: October 26, 2020

SCHAFER, Judge.

{¶1} Defendant-Appellant, Joseph Mosley, appeals from his convictions in the Wayne County Court of Common Pleas. This Court affirms.

I.

{¶2} Early one evening in December, two twelve-year-old girls were accosted at gun point just outside one of their homes. The two girls, A.F. and T.C., were walking up to T.C.'s house when a man ran up behind A.F. and shoved her to the ground. The man forced the girls to the side of the house and asked if they had any money. Though they handed over what little money and property they had, the man was unsatisfied. He continued to hold them at gunpoint and told them "he wanted his d*** sucked."

{¶3} The arrival of a neighbor spooked the man, and he ordered the girls to walk around to the back of the house. The house was a multi-unit dwelling and had a basement whose cellar door had been concealed with a piece of wood. As T.C. backed away from the man, she fell

through the cellar door and down several steps into the basement. The man then helped her out before taking the girls down into the basement.

{¶4} While in the basement, the man forced the girls to remove their clothing. He ordered them to perform sexual acts on one another and threatened to kill them if they did not comply. Afterward, he anally raped each girl and forced them to perform fellatio. The man ejaculated onto the basement floor and used a sock he found in the basement to wipe up the mess. He then allowed the girls to dress and released them. The girls ran and, once they were inside T.C.'s house, T.C. told her mother she had been raped.

{¶5} The police came to T.C.'s house and, shortly thereafter, both girls were taken to the hospital and child advocacy center for treatment and interviews. As soon as T.C.'s mother learned what happened to her daughter, she began reaching out to friends and social media contacts, sharing a description of the man who had attacked the girls and asking for help identifying him. Her efforts yielded two possibilities, one of whom was Mosley. She showed a picture of Mosley to T.C. while they waited at the child advocacy center, and T.C. confirmed that he was the man who had attacked her. The following day, both she and A.F. selected Mosley from a photo array and a warrant was issued for his arrest.

{¶6} The police attempted to stop Mosley as he approached a gas station on foot, but he fled as soon as he made eye contact with an officer. Mosley ran a short distance before an officer tackled him and he was taken into custody. His DNA sample was taken at the police station and submitted for testing, along with evidence the police collected from the crime scene. When examining swabs of a sock and washcloth taken from the scene, analysts detected sperm cells. Analysts determined that one person had contributed the cells, the estimated frequency of

occurrence of that DNA profile was 1 in 1 trillion individuals, and the profile was consistent with Mosley's DNA profile.

{¶7} Relevant to this appeal, a grand jury indicted Mosley on four counts of rape, two counts of kidnapping, two counts of robbery, and one count of obstructing official business.[1] All but one of his counts carried a repeat violent offender specification, and his kidnapping counts alleged that he acted with a sexual motivation. At the conclusion of a jury trial, the jury found Mosley guilty on all counts. The jury further found that both girls were less than 13 years of age when Mosley assaulted them, he purposely compelled them to submit by force or the threat of force, and he committed his kidnapping offenses with a sexual motivation. The trial court held a hearing on Mosely's repeat violent offender specifications and found him to be a repeat violent offender. The court merged several of his convictions as allied offenses of similar import, but ultimately sentenced him to serve 100 years to life in prison.

{¶8} Mosley filed a motion for new trial before sentencing, and the trial court denied his motion. He then filed his appeal and, several weeks later, moved for a new trial based on newly discovered evidence. This Court agreed to stay the appellate proceedings and remand the matter for the trial court to rule on the second motion for new trial. On remand, the trial court denied Mosley's second motion.

{¶9} Mosley now appeals from his convictions and raises six assignments of error for our review. To facilitate our analysis, we rearrange several of the assignments of error.

---

[1] Mosley also was charged with various drug-related offenses based on items the police discovered when searching his home. Those counts were severed for purposes of trial and later dismissed without prejudice.

II.

**Assignment of Error III**

**The convictions and sentences are contrary to law in violation of Ohio's Constitution and Amendments to the United States Constitution as against the manifest weight of the evidence.**

{¶10}  In his third assignment of error, Mosley argues that his convictions are against the manifest weight of the evidence.  We disagree.

{¶11}  When considering an argument that a criminal conviction is against the manifest weight standard, this Court is required to

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).  Courts are cautioned to only reverse a conviction on manifest weight grounds "in exceptional cases," *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340, where the evidence "weighs heavily against the conviction[,]" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶12}  A.F. and T.C. testified that they were twelve years old when these events transpired. The girls testified that they left T.C.'s house in the early evening and walked to another girl's house before walking to McDonald's to purchase some fries.  Surveillance footage from the McDonald's showed the girls arriving around 5:42 p.m. and leaving about ten minutes later. Surveillance footage from a different store showed them continuing to walk in the direction of T.C.'s house a few minutes after 6:00 p.m.

{¶13}  The girls testified that, when they reached T.C.'s house, a man with a gun attacked them.  They both described the man as having a neck tattoo and a mixed complexion, as if he were a combination of Caucasian and African American.  Additionally, T.C. remembered the man being

clean shaven and wearing a large brown jacket. The girls testified that the man led them to the side of T.C.'s house and asked them for money. After they gave him their money, the man told the girls "he wanted his d*** sucked." Before things could go further, T.C. testified, another resident of the multi-unit dwelling where she lived with her family arrived home. His arrival prompted the man to order the girls to the back of the house.

{¶14} A.F. and T.C. testified that, at the back of the house, T.C. fell through a covered cellar door and into a basement. Upon his discovery of the basement, the man led the girls downstairs and ordered them to strip. The girls testified that the man pointed the gun at them when they hesitated, so they followed his orders. While they were in the basement, he forced them to touch either themselves or one another, to engage in oral sex with one another, and to perform fellatio. Additionally, the man anally raped each girl. The girls testified that, after he raped them, "white stuff" came out of the man's penis and fell onto the ground. T.C. testified that the basement was messy, and the man found a sock in a pile of clothes. She remembered the sock being colorful and testified that the man used it to wipe up the white stuff. Eventually, the man released the girls, and they ran from the basement.

{¶15} A 911 call came through at 6:24 p.m., reporting the rape and instructing officers to be on the lookout for a light-skinned man with tattoos and a brown coat. As police responded to T.C.'s home, her mother and a friend began searching outside for the girls' assailant. They saw a man on the street who appeared to meet the assailant's description and confronted him. The man, G.H., denied any responsibility, so T.C.'s mother took note of his name and returned to the house to speak with the police. At that point, she also sent out "hundreds of messages" by way of social media and text, asking for help identifying her daughter's assailant. In doing so, she included a description of the man and indicated that G.H. might have been involved. Numerous people

replied to her plea for help and another possible suspect emerged. The other possible suspect was Mosley.

{¶16} T.C.'s mother testified that she showed T.C. a picture of G.H. while they were waiting at the child advocacy center and T.C. indicated that he was not the man who attacked her. She then showed her daughter several more pictures, including one of Mosley. The mother testified that, when T.C. saw Mosley's picture, she confirmed that he was the man who had attacked her.

{¶17} The following day, the police compiled a photo array and included a picture of Mosley in the array. An officer presented the array to A.F. in the morning and to T.C. several hours later. The officer testified that both girls selected Mosley from the array and that his picture sparked an emotional reaction from both girls.

{¶18} The State produced evidence that Mosley lived one block to the south of T.C.'s house. Based on his proximity, his appearance, the girls' description of their attacker, and the results of the photo array, a warrant was issued for his arrest. A team of officers gathered to arrest Mosley just before noon the day after the rapes occurred. Officer Brian Waddell spotted Mosley on foot as he pulled into the parking lot of a gas station in his marked cruiser. He stated that, as soon as he emerged from his cruiser, Mosley made eye contact with him and immediately began running away. He then ran after Mosley while commanding him to stop and informing other officers that Mosley was running.

{¶19} Detective Juan McCloud also was present when Mosley tried to run. He testified that Mosley had been walking alongside four other individuals and was the only one who "took off running" when he saw officers approaching. The chase ended a few seconds later when another officer tackled Mosley. Once Mosley was handcuffed, Detective McCloud testified, he offered an

alibi for his whereabouts the previous evening. Specifically, Mosley told the detective that he was at the hospital just after 7:00 p.m. because he "felt like [he] had a knife [] stuck in [his] stomach."

{¶20} There was testimony that Mosley lived about 1.5 miles from Wooster Community Hospital. Surveillance footage from the hospital showed him casually walking into the emergency room with a female just after 7:00 p.m. As part of its forensic investigation, the police department asked BCI to analyze Mosley's cell phone, concentrating on any activity that might have occurred around the time of the rape. The evidence showed that Mosley missed two calls from the woman who brought him to the hospital. The first of those calls came through at 6:11 p.m. and the second came in at 6:21 p.m. The BCI analyst also discovered that, at 7:16 p.m., Mosley searched the Google Play store for an application for his phone. The search that he conducted was for a police scanner.

{¶21} After Detective Anthony Lemmon listened to the interviews A.C. and T.F. gave at the child advocacy center, he searched the basement where the rapes had occurred. He was aware that the rapist may have used a sock to clean his ejaculate from the ground, so he made a point of looking for socks and uncovered four different kinds. He also found a washcloth lying on a table and decided to collect it as well. Both the socks and the washcloth were submitted to BCI for testing, along with A.C.'s and T.F.'s rape kits and underwear.

{¶22} A mixture of DNA, including male DNA, was detected on a swab taken from the back panel of T.C.'s underwear using polymerase chain reaction testing. The data was not sufficient for comparison, however, so the sample was forwarded on for additional testing. No semen was identified on the samples from the rape kits or on the girls' underwear. Yet, it was found on one of the socks and on the washcloth. An analyst performed DNA testing on those two items. She testified that one person had contributed the sperm cells detected on the items, the

estimated frequency of occurrence of that DNA profile was 1 in 1 trillion individuals, and the profile was consistent with Mosley's DNA profile.

{¶23} After polymerase chain reaction testing proved futile, a different analyst performed Y-STR testing on the swabs taken from the back panel of T.C.'s underwear. The analyst explained that, unlike polymerase chain reaction testing, Y-STR testing looks strictly for male DNA as it focuses on the Y chromosome. The analyst testified that Mosley was included in the male DNA the test detected on the back panel of T.C.'s underwear and neither he, nor any of his paternal male relatives could be excluded as the source of that DNA.

{¶24} Mosley argues that the jury lost its way when it convicted him because it was swayed by evidence that was not properly admitted or argued. He claims that the State repeatedly misrepresented the DNA evidence against him and engaged in the "prosecutor's fallacy" by overstating its statistical significance. He notes that no one ever testified that his DNA conclusively matched the DNA found on any of the swabs submitted for testing. He further notes that, while many items were tested, very few produced results. Because the State wrongfully portrayed him as the source of the DNA it uncovered in the absence of proof to that effect, he argues, his convictions are against the manifest weight of the evidence. The argument portion of his brief also contains a solitary assertion that his convictions are against the manifest weight of the evidence because the identification made by one of the girls "was tainted[.]"

{¶25} Initially, we note that Mosley has specifically alleged misconduct on the part of the prosecutor in his second assignment of error. *See* Discussion, *infra*. His argument to that effect likewise concerns the "prosecutor's fallacy" and the State's representations about the DNA evidence. We will respond to those arguments in our analysis of his second assignment of error rather than duplicating that analysis herein. *See id.* In performing our manifest weight review, we

will consider the evidence set forth at trial, the reasonable inferences to be drawn therefrom, and the credibility of the witnesses. *See Otten*, 33 Ohio App.3d at 340.

{¶26} Having reviewed the record, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it convicted Mosley. *See id.* Both victims identified Mosley as the man who raped them. While he claims that one of their identifications was "tainted," he has not developed an argument to that effect, and this Court will not do so on his behalf. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support this assignment of error, it is not this court's duty to root it out."). Mosley lived only one block from T.C.'s house and missed two calls on his cell phone around the time the girls were attacked. Although he claimed that he was suffering from significant abdominal pain at that time, surveillance footage from the nearby hospital he visited showed him casually walking in without any visible trace of discomfort. He also did not arrive at the hospital until just after 7:00 p.m., more than thirty minutes after the rapes were reported to the police.

{¶27} The State set forth evidence that, not long after his arrival at the hospital, Mosley used his phone to search for a "police scanner" application. He also ran the following morning when confronted by the police. *See State v. McCormick*, 9th Dist. Summit No. 29121, 2019-Ohio-2204, ¶ 19 (flight may be considered as consciousness of guilt). There was testimony that the girls' rapist used a sock to wipe his ejaculate from the ground, and DNA analysts found sperm cells on a sock collected from the basement. Those cells came from one person, the estimated frequency of occurrence of that DNA profile was 1 in 1 trillion individuals, and the profile was consistent with Mosley's DNA profile. Moreover, there was testimony that he could not be

excluded as the source of the DNA that analysts uncovered on T.C.'s underwear when performing Y-STR testing.

{¶28} The State set forth overwhelming evidence in support of Mosley's convictions. Upon review, he has not shown that this is the exceptional case where the jury lost its way by convicting him. *See Otten*, 33 Ohio App.3d at 340. Accordingly, his third assignment of error is overruled.

### Assignment of Error I

**The convictions and sentences are contrary to law in violation of Ohio's Constitution and Amendments to the United States Constitution due to prejudicial error, plain error, and structural error in charging the jury that it could find the accused not guilty if the state failed to prove all elements of one or more of the charges.**

{¶29} In his first assignment of error, Mosley argues that the trial court committed either error, plain error, or structural error in its instructions to the jury. He challenges the court's instruction that the jury could acquit him of an offense only if it determined that the State failed to prove "all" the essential elements of that offense beyond a reasonable doubt. Upon review, we reject Mosley's argument.

{¶30} In general, "[t]his Court reviews a trial court's decision to give or not give jury instructions for an abuse of discretion under the particular facts and circumstances of the case." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 68. If a defendant fails to preserve his objection to a trial court's jury instructions, however, he is limited to a claim of plain error. *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 20. *See also* Crim.R. 52(B). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Plain error exists only where there is a deviation from a legal rule,

that is obvious, and that affected the defendant's substantial rights to the extent that it affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶31} The trial court issued the majority of its jury instructions before closing arguments. Once the parties completed their arguments, it issued additional instructions. At that time, the court instructed the jury as follows:

> JUDGE: As I told you before when we went through the instructions, if you find the State has proven beyond a reasonable doubt, all the essential elements of any one or more of the offenses charged in the separate counts in the indictment, your verdict has to be guilty as to separate offense or offenses, according to your findings. On the other hand, if you find the State failed to prove beyond a reasonable doubt any of the essential elements, *excuse me, all the essential elements* of any one or more of the offenses charged in the separate counts, your verdict must be not guilty as to such offense or offenses.

(Emphasis added.) The portion of the written jury instructions from which the court was reading likewise provided: "If you find the State failed to prove beyond a reasonable doubt all the essential elements of any one or more of the offenses charged in the separate counts in the indictment, your verdict must be not guilty as to such offense or offenses according to your findings."

{¶32} Mosley did not object to the trial court's instruction. He concedes as much, but argues that this Court should nevertheless treat his argument as if he had preserved it. According to Mosley, the trial court modeled its jury instructions after the State's proposed instructions, and he was never properly served with a copy of the proposed instructions. That is because the certificate of service for the proposed instructions was never signed by hand or e-signature as required by Crim.R. 49(C). He further claims that he was never afforded an opportunity to object to the court's jury instructions outside the presence of the jury. *See* Crim.R. 30(A). In light of these deficiencies, Mosley argues, he is entitled to a review on the merits rather than a review for plain error.

{¶33} Mosley has failed to set forth any support for the notion that a party is relieved of his duty to object to jury instructions when an opposing party proffers written instructions and, in serving them, fails to comply with Crim.R. 49(C)'s signature requirement. *See* App.R. 16(A)(7); *Cardone*, 1998 WL 224934, at *8. The record reflects that the State e-filed its proposed jury instructions. The certificate of service for that e-filing certifies that the instructions were served on Mosley's counsel. Mosley never informed the court that he had not received the instructions. Nor did he object to them on the basis that they did not contain a valid e-signature. Because he failed to raise this issue in the lower court and, in any event, has not explained why a defect of this nature would absolve him of his duty to object under Crim.R. 30(A), we reject his argument that it entitles him to a merits review.

{¶34} Likewise, we reject Mosley's argument that he is entitled to a merits review because he was not afforded an opportunity to object to the jury instructions outside the presence of the jury. *See* Crim.R. 30(A). When the court finished reading the instructions, it specifically asked the attorneys whether there was anything further they needed to address. Both the prosecutor and Mosley's counsel indicated that there were no issues that needed to be addressed. Although the jury was present during that exchange, the court then informed the attorneys that it had an inquiry and asked them to approach for a sidebar. The sidebar discussion was not made a part of the record, so it is unclear what matters were discussed. Nevertheless, if Mosley had any issues with the jury instructions, he had the opportunity to bring those issues to the court's attention at that time. There is no indication that he did so. Further, there is no indication that he objected to the court's instruction at any point in the lower court. Because Mosley failed to preserve his objection to the trial court's jury instruction, he is limited to a claim of plain error. *See Fry*, 2017-Ohio-9077, at ¶ 20; Crim.R. 52(B).

{¶35} Mosley argues that the trial court committed plain error when it instructed the jury that a not guilty verdict was appropriate only if the State failed to prove "all the essential elements" of an offense beyond a reasonable doubt. He notes that the quoted language was taken from the instruction on a guilty verdict. As to a not guilty verdict, Mosley argues, the jury should have been instructed to acquit him if the State failed to prove "any of the essential elements" of an offense beyond a reasonable doubt. Mosley claims that the court prejudiced his substantial rights when it confused the two standards.

{¶36} Jury instructions must be reviewed as a whole. *State v. Tyler*, 9th Dist. Summit No. 29225, 2019-Ohio-4661, ¶ 50, quoting *State v. Schell*, 9th Dist. Summit No. 28255, 2017-Ohio-2641, ¶ 38.

> "If, taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled. Moreover, misstatements and ambiguity in a portion of the instructions will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party."

*State v. Lollis*, 9th Dist. Summit No. 26607, 2014-Ohio-684, ¶ 35, quoting *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist.1993).

{¶37} Although the trial court erred when it issued the jury the above-quoted instruction on the requirement for a not guilty verdict, we cannot conclude that its instruction resulted in plain error. At the beginning of its jury instructions, the court specifically instructed the jury that the State bore "the burden of proving each of the essential elements of any charge * * * beyond a reasonable doubt" and that Mosley "must be acquitted unless the State produce[d] evidence which convince[d] [the jury] beyond a reasonable doubt of every essential element of the offenses

charged in the indictment." Further, with the exception of one of the kidnapping counts,[2] the court issued the jury the following instruction on each of Mosley's remaining counts: "If you find the State failed to prove any of the essential elements of the offense [at issue], your verdict must be not guilty according to your findings." The jury, therefore, heard the correct instruction on the requirement for a not guilty verdict nine separate times as the instructions were read. "The instructions as a whole clearly conveyed the state's burden to prove every element of the offenses charged to permit a guilty finding." *State v. Hessler*, 90 Ohio St.3d 108, 115 (2000). Moreover, the evidence against Mosley was compelling. *See* Discussion, *supra*. Mosley has not shown that, but for the court's single erroneous instruction, the result in this matter would have been different. *See Barnes*, 94 Ohio St.3d at 27. *See also Hessler* at 115. We, therefore, reject his argument that the trial court committed plain error when it instructed the jury.

{¶38} Mosley also argues that the trial court's error in instructing the jury constituted structural error. Yet, the structural error doctrine applies "only in a 'very limited class of cases.'" *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 18, quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997). "[B]efore the doctrine applies, an appellant first must demonstrate that a constitutional error actually occurred." *State v. Robinson-Bey*, 9th Dist. Summit No. 28740, 2018-Ohio-5224, ¶ 53. Citing *Sullivan v. Louisiana*, 508 U.S. 275 (1993), Mosley argues that a constitutional error occurs when a court fails to properly instruct a jury on reasonable doubt. Yet, the trial court here did not issue the jury a defective reasonable doubt instruction. *Compare Sullivan* at 275, citing *Cage v. Louisiana*, 498 U.S. 39 (1990). It properly instructed the jury on reasonable doubt and issued them one defective instruction on the requirement for a not guilty

---

[2] On the first kidnapping count, the court only instructed the jury that their verdict must be guilty if the State proved all the elements of the offense beyond a reasonable doubt. The court neglected to include the additional instruction regarding a not guilty verdict.

verdict. The type of error it committed is one that the Ohio Supreme Court has reviewed under the plain error standard. *See Hessler* at 115. Because Mosley has not shown that the trial court committed a constitutional error in its instruction to the jury, we decline to apply the structural error doctrine herein. *See Robinson-Bey* at ¶ 53. Mosley's first assignment of error is overruled.

### Assignment of Error II

**The convictions and sentences are contrary to law, in violation of Ohio's Constitution and Amendments to the United States Constitution, due to prejudicial errors in denial of timely motions for new trial.**

{¶39} In his second assignment of error, Mosley argues that the trial court erred when it denied his motions for new trial. Those motions were based on prosecutorial misconduct, juror misconduct, and newly discovered, exculpatory evidence the State allegedly failed to disclose before trial. Upon review, we do not agree that the trial court erred when it denied Mosley's motions.

{¶40} A defendant may move for a new trial when his substantial rights have been materially affected by juror misconduct, prosecutorial misconduct, or the discovery of new, material evidence that previously could not have been discovered with reasonable diligence. *See* Crim.R. 33(A)(2), (6). This Court generally reviews a trial court's decision to deny a motion for new trial for an abuse of discretion. *State v. Bressi*, 9th Dist. Summit No. 29257, 2020-Ohio-4, ¶ 7; *State v. Pyle*, 9th Dist. Summit No. 28802, 2018-Ohio-3160, ¶ 47. Likewise, we review for an abuse of discretion a trial court's decision whether to hold a hearing on a motion for new trial. *State v. Powe*, 9th Dist. Summit No. 29413, 2019-Ohio-5332, ¶ 9. An abuse of discretion implies the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

Juror Misconduct

{¶41} When a defendant moves for a new trial on the basis of juror misconduct, a trial court must conduct a two-part inquiry. *See Pyle* at ¶ 50. "The first determination is whether misconduct actually occurred, and the second is whether that misconduct materially prejudiced the defendant's substantial rights." *State v. Jalowiec*, 9th Dist. Lorain No. 14CA010548, 2015-Ohio-5042, ¶ 48. Claims of juror misconduct "must be sustained by affidavit showing their truth * * *." Crim.R. 33(C). Additionally, "the evidence of the alleged misconduct must come from a 'source, other than one of the jurors, who possesses firsthand knowledge of the misconduct.'" *State v. Leggett*, 9th Dist. Summit No. 18303, 1997 WL 775688, * 5 (Oct. 29, 1997), quoting *State v. Roudebush*, 9th Dist. Wayne No. 96CA0025, 1996 WL 625248, * 1 (Oct. 30, 1996). "Juror testimony is generally not admissible to impeach a jury verdict unless there is supporting evidence aliunde." *State v. Penix*, 9th Dist. Summit No. 23699, 2008-Ohio-1051, ¶ 38. *See also* Evid.R. 606(B). "The purpose of the aliunde rule is to maintain the sanctity of the jury room and the deliberations therein." (Emphasis omitted.) *Hessler*, 90 Ohio St.3d at 123.

{¶42} Mosley supported his motion for new trial with affidavits from his two attorneys. Both attorneys averred that they were alerted to two instances of juror misconduct when speaking with the jurors after trial. One juror had said he felt Mosley was guilty because he did not testify in his own defense. Others had said they felt sympathy for a State's witness due to defense counsel's cross-examination. Mosley argued that their admissions evidenced their failure to follow the court's instructions and decide the matter based strictly on the evidence presented at trial.

{¶43} Upon review, Mosley failed to demonstrate that any juror misconduct occurred. *See Jalowiec* at ¶ 48. The only evidence he presented in support of his argument came directly from his attorneys' discussion with the jurors. He failed to set forth any "extraneous, independent

evidence of alleged conduct based on the firsthand knowledge of one who is not a juror." *State v. Scheck*, 9th Dist. Medina No. 05CA0033-M, 2006-Ohio-647, ¶ 25. Without that evidence, his attorneys were "incompetent to testify to the [jurors'] [] statements." *Id.* at ¶ 26. *See also* Evid.R. 606(B). Because Mosley failed to set forth any admissible evidence in support of his claim of juror misconduct, the trial court did not abuse its discretion when it denied that portion of his motion for new trial.

Prosecutorial Misconduct

{¶44} As with a claim of juror misconduct, trial courts assessing a motion for new trial based on prosecutorial misconduct must engage in a two-step inquiry. *Jalowiec* at ¶ 48. "The first determination is whether misconduct actually occurred, and the second is whether that misconduct materially prejudiced the defendant's substantial rights." *Id.* "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6. "The defendant must show that, but for the prosecutor's misconduct, the jury would not have convicted him." *State v. Wright*, 9th Dist. Summit No. 25280, 2010-Ohio-5106, ¶ 22.

{¶45} "Prosecutors must avoid insinuations and assertions calculated to mislead." *State v. Lott*, 51 Ohio St.3d 160, 166 (1990). "'A prosecutor, however, is permitted to comment freely on what the evidence has shown and what reasonable inferences may be drawn therefrom.'" *State v. M.G.*, 9th Dist. Medina No. 15CA0067-M, 2017-Ohio-4210, ¶ 13, quoting *State v. Colvin*, 9th Dist. Summit No. 26063, 2012-Ohio-4914, ¶ 23. "Ohio law grants prosecutors wide latitude * * *." *State v. Wittman*, 9th Dist. Summit No. 23291, 2006-Ohio-6971, ¶ 6.

{¶46} At trial, the State drew heavily upon the DNA evidence in crafting a theme for its case. At the center of its theme was the concept of "125 Earths." The prosecutor argued that "125

is the exact amount of planet Earths that there would have to be of roughly eight billion people for someone, for anyone, to have the exact same sperm fraction DNA as Joseph Mosley." The State utilized the "125 Earths" theme in both opening statements and closing arguments. Mosley argues that the State's theme was a "DNA fallacy" that was not based on the evidence.

{¶47} As previously noted, a DNA analyst from BCI testified that she detected sperm on a sock and a washcloth taken from the crime scene. She testified that one person had contributed the cells, the estimated frequency of occurrence of that DNA profile was 1 in 1 trillion individuals, and the profile was consistent with Mosley's DNA profile. She specifically explained that her conclusion meant that "if [she] tested approximately one trillion individuals, [she] would expect that only one would have a DNA profile consistent with that sperm fraction." The prosecutor asked the analyst about Earth's current population, and she answered that there were about eight billion people on Earth. She also testified, in response to further inquiry, that there are 1,000 billions in 1 trillion. The State, therefore, divided 1 trillion by eight billion to arrive at its argument that there would have to be 125 Earths for someone else to have the same DNA profile as Mosley.

{¶48} The United States Supreme Court has explained the so-called "prosecutor's fallacy" as follows:

> The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample. *See* Nat. Research Council, Comm. on DNA Forensic Science, The Evaluation of Forensic DNA Evidence 133 (1996) ("Let P equal the probability of a match, given the evidence genotype. The fallacy is to say that P is also the probability that the DNA at the crime scene came from someone other than the defendant"). In other words, if a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy. It is further error to equate source probability with probability of guilt, unless there is no explanation other than guilt for a person to be the source of crime-scene DNA. This faulty reasoning may result in an erroneous statement that, based on a random match probability of 1 in 10,000,

there is a 0.01% chance the defendant is innocent or a 99.99% chance the defendant is guilty.

*McDaniel v. Brown*, 558 U.S. 120, 128 (2010). The fallacy also has been explained, by way of example, as using the conclusion that "'there is a 99.9% chance that the animal will have two arms and two legs given that it is a chimpanzee'" to form the conclusion that "'there is a 99.9% chance that the animal is a chimpanzee given that it has two arms and two legs.'" Browne, Kingsley R., *Pernicious P-Values: Statistical Proof of Not Very Much*, 42 U. Dayton L.Rev. 113, 115 (2017). Random match probability is distinct from source probability, and it is error to confuse the two. *See McDaniel* at 128.

**{¶49}** Upon review, Mosley has not shown that the State engaged in misconduct when fashioning its theme and argument about the DNA evidence. *See Jalowiec*, 2015-Ohio-5042, at ¶ 48. The State properly highlighted the rarity of Mosley's DNA profile and the odds of that profile appearing again in the general population (random match probability). The prosecutor never argued that there was less than a 1% chance Mosley was innocent. Indeed, the analyst from BCI specifically testified that she did not perform source attribution. The State's "125 Earths" argument was a reasonable inference drawn from simple math, *see M.G.*, 2017-Ohio-4210, at ¶ 13, quoting *Colvin*, 2012-Ohio-4914, at ¶ 23, and the record supports the trial court's determination that it was "consistent with the evidence." *Compare Whack v. State*, 433 Md. 728, 746 (2013) (analyst's testimony that defendant's DNA might have been present at the scene did not support prosecutor's argument, "stating emphatically that [the defendant's] DNA was present"). Mosley has not shown that the prosecutor confused source probability with random match probability or otherwise misrepresented the DNA evidence. *See McDaniel* at ¶ 28; *Whack* at 753. Accordingly, we cannot conclude that the trial court abused its discretion when it rejected his claim of prosecutorial misconduct.

Newly Discovered Evidence

{¶50} A defendant who moves for a new trial based on newly discovered evidence generally must show that the new evidence

> "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."

*Jalowiec* at ¶ 30, quoting *State v. Petro*, 148 Ohio St. 505 (1947), syllabus. The materiality standard is lessened if the defendant claims that the newly discovered evidence was withheld by the State in violation of his due process rights. *Jalowiec* at ¶ 32. In that instance, the defendant must show that (1) the evidence is favorable to him "either because it is exculpatory[] or * * * impeaching;" (2) the State suppressed it "either willfully or inadvertently;" and (3) he sustained prejudice. *Id.* at ¶ 31, quoting *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). *See also Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Undisclosed evidence is 'material' when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Jalowiec* at ¶ 31, quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985).

{¶51} Mosley moved for a new trial based on the State's failure to produce his medical records from the county jail. His attorneys indicated that, unbeknownst to them at trial, Mosley was being treated for chlamydia at the time of the alleged rapes. Medical records from the jail show that his antibiotics were brought to the jail and administered to him for several days. Mosley attached the jail records to his motion, as well as records from Wooster Community Hospital. The hospital records show that he was diagnosed with chlamydia twelve days before the rapes occurred and prescribed the antibiotic.

{¶52} Mosley argues that chlamydia is a highly infectious sexually transmitted disease ("STD") that likely would have been transmitted to A.F. or T.C. if he had raped them. Because neither victim was treated for chlamydia, he argues, there is a reasonable probability that the result of the proceedings would have been different if the jury had heard evidence about his condition. Mosley argues that he is entitled to a new trial due to the State's failure to disclose "the STD evidence[.]"

{¶53} Upon review, Mosley has not shown that the trial court abused its discretion when it denied his motion for a new trial based on newly discovered evidence. *See Bressi*, 2020-Ohio-4, at ¶ 7. Mosley could have discovered the evidence at issue with due diligence, given that he would have been aware of his own medical diagnosis and treatment history. *See Jalowiec*, 2015-Ohio-5042, at ¶ 40. The fact that he may not have shared that information with his attorneys before trial is inapposite. He has not shown that the State suppressed the evidence. *See id.* at ¶ 31. Moreover, he has not shown that there is a reasonable probability that, had his attorneys been aware of that information, the result of the proceeding would have been different. *See id.* at ¶ 31, quoting *Bagley*, 473 U.S. at 682. Mosley failed to produce any evidence indicating how many days' worth of medication he was prescribed to treat his chlamydia. Nevertheless, the records attached to his motion show that he was prescribed an antibiotic almost two weeks before the rapes and continued his course of treatment for several days at the jail. Mosley's argument that he was still contagious when the girls were raped is purely speculative. *See Jalowiec* at ¶ 41. It also overlooks the overwhelming evidence against him at trial, including DNA evidence and the fact that both girls positively identified him. *See State v. Prade*, 9th Dist. Summit No. 28193, 2018-Ohio-3551, ¶ 55, quoting *State v. Murley*, 2d Dist. Champaign No. 08-CA-26, 2009-Ohio-6393, ¶ 26 ("'[T]he mere possibility of a different outcome is insufficient' to warrant the granting of a

motion for new trial."). Because Mosley could have discovered the jail records in the exercise of due diligence and, in any event, has not shown that they were material to his defense, we reject his argument that the trial court erred by denying his motion for new trial. His second assignment of error is overruled.

## Assignment of Error IV

**The convictions and sentences are contrary to law in violation of Ohio's Constitution and Amendments to the United States Constitution due to prejudicial and plain errors depriving the accused the right to testify in his own defense.**

{¶54} In his fourth assignment of error, Mosley argues that his constitutional rights were violated when he was denied the right to testify in his own defense. According to Mosley, he was never afforded an opportunity to testify or to knowingly waive his right to do so. This Court rejects his argument.

{¶55} "The right to testify at one's own criminal trial is rooted in the Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth Amendment, and the Fifth Amendment's privilege against self-incrimination." *State v. Fry*, 9th Dist. Summit No. 28907, 2019-Ohio-958, ¶ 24. It "is regarded both as a fundamental and a personal right that is waivable only by an accused." *State v. Bey*, 85 Ohio St.3d 487, 497 (1999). Even so, "a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Emphasis sic.) *Id.* Such inquiries "[may] be harmful because [they] 'place[] the judge between the lawyer and his client and can produce confusion as well as delay.'" *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 163, quoting *Bey* at 499. "Barring any statements or actions from the defendant indicating either disagreement with counsel or the desire to testify, the trial court is not required to ensure that the defendant has waived the right to testify on the record." *Fry* at ¶ 24. "'Waiver is presumed from the defendant's failure to testify or notify the

trial court of the desire to do so.'" *Id.*, quoting *United States v. Webber*, 208 F.3d 545, 551 (6th Cir.2000).

{¶56} Mosley did not testify in his own defense, and the defense rested subject to the admission of its exhibits. When the court afforded Mosley his right of allocution at sentencing, he then talked at length about his innocence and the problems he perceived with his trial. In doing so, he stated: "I did not take the stand in my own defense, which you did not ask me as to anyone, would I take the stand in my own defense, which I would have, and I would've said yes, and I still say yes, and I want to take the stand in my own defense." Mosley points to his allocution statements as evidence that he vocalized his desire to testify.

{¶57} The record does not support the conclusion that Mosley was denied his right to testify in his own defense. At no point during the guilt phase of his trial did he notify the court, either by statement or action, that he wished to testify. *See Fry* at ¶ 24. Nor is there any indication in the record that he was unaware of his right to testify or that he and his attorneys were having a difference of opinion as to whether he should take the stand. *See id. Accord State v. Manso*, 9th Dist. Summit No. 26727, 2014-Ohio-1388, ¶ 35. Mosley only claimed that he wanted to testify after the jury found him guilty. *See State v. Huth*, 9th Dist. Summit No. 17351, 1996 WL 425897, *8 (July 31, 1996) ("There is little doubt that in any trial, later review will expose things which those with the luxury of hindsight might have done better or differently."). His statements at sentencing were merely a reflection of his desire for a second bite at the apple.

{¶58} Absent any indication that Mosley wished to exercise his right to testify, the trial court was not required to ask him whether he wanted to waive that right. *Bey*, 85 Ohio St.3d at 497; *Manso* at ¶ 35. Mosley has not shown that he was denied his right to testify. Consequently, his fourth assignment of error is overruled.

**Assignment of Error V**

**The sentences are not supported by clear and convincing evidence and are contrary to law in violation of Ohio's Constitution and Amendments to the United States Constitution due to prejudicial, plain, and structural error.**

{¶59} In his fifth assignment of error, Mosley challenges various aspects of his sentence. He argues that several of his convictions should have merged as allied offenses of similar import. He further argues that the trial court erred when it found that he was a repeat violent offender, subject to a penalty enhancement. Upon review, we reject his arguments.

Allied Offenses

{¶60} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and [Article I, Section 10,] of the Ohio Constitution, which prohibits multiple punishments for the same offense." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 23. The statute provides, in relevant part:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25(A), (B). The Supreme Court of Ohio has held that when a defendant's conduct supports multiple offenses, that defendant may be convicted of all offenses if "(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph three of the syllabus.

{¶61} "This Court generally applies a de novo standard of review when reviewing a trial court's decision regarding the merger of convictions for the purposes of sentencing." *State v.*

*Harris*, 9th Dist. Medina No. 16CA0054-M, 2017-Ohio-8263, ¶ 25, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1. "When applying the de novo standard of review, this Court gives no deference to the trial court's legal determinations." *State v. West*, 9th Dist. Lorain No. 04CA008554, 2005-Ohio-990, ¶ 33.

{¶62} Mosley was found guilty of four counts of rape, but the court merged two of those counts as allied offenses of similar import. His two remaining counts, one of which pertained to A.C. and one of which pertained to T.F., required the State to prove that he engaged in sexual conduct with the girls when they were less than thirteen years of age. *See* R.C. 2907.02(A)(1)(b). He also was found guilty of two counts of kidnapping with a sexual motivation and two counts of robbery (with one count of each crime pertaining to each girl). His kidnapping counts required the State to prove that he used force, the threat of force, or any means to remove the girls from a place or restrain their liberty for the purpose of engaging in sexual activity with them against their will. *See* R.C. 2905.01(A)(4). His robbery counts required the State to prove that he used or threatened the immediate use of force against the girls in the attempted commission or commission of a theft. *See* R.C. 2911.02(A)(2).

{¶63} Mosley argues that his rape and kidnapping counts should have merged because his kidnapping counts required the State to prove sexual motivation. If he kidnapped the girls to engage in sexual activity with them, Mosley argues, there was no separate animus for his rape offenses. He further argues that his robbery convictions should have merged with his rape and kidnapping convictions because the robbery was merely "the ruse to stop the girls for rape." Finally, he argues that he should be discharged for time served on his obstructing count because the court imposed "90 days 'already served'" on that count.

{¶64} "[W]hen rape and kidnapping are committed separately or with separate animus, they are not allied offenses." *State v. Roberts*, 9th Dist. Medina No. 19CA0004-M, 2019-Ohio-4393, ¶ 11, citing *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, at syllabus. At sentencing, the State argued that Mosley either possessed a separate animus for his offenses or committed them separately due to the passage of time. The trial court agreed with its argument, and the record supports that conclusion. The testimony showed that Mosley forced the girls from the porch of T.C.'s house at gun point and took them to the side of the house. He then asked them for money and took the money they offered. Only after he took their money did he tell the girls that he wanted them to perform fellatio. The record, therefore, supports the court's determination that the robbery was either committed separately or with a separate animus and was not merely a "ruse." *See Ruff* at syllabus.

{¶65} The record also supports the court's decision not to merge Mosley's rape and kidnapping as allied offenses. The crime of kidnapping was complete at the point that Mosley held the girls at the side of the house at gun point and demanded oral sex. *See* R.C. 2905.01(A)(4). There was testimony that the arrival of a neighbor provided an interruption and, rather than release the girls, Mosley forced them to the back of the house and down into the basement where he eventually raped with them. Prior to his discovery of the basement, Mosley gave no indication that he intended to anally rape the girls. The trial court, therefore, did not err when it found that his offenses were committed separately or with a separate animus. *See Roberts* at ¶ 11.

{¶66} Mosley's brief also contains an argument that he "should be discharged for time served" on his obstructing count because the court imposed "90 days 'already served'" when sentencing him on that count. The record reflects that, at the sentencing hearing, the court sentenced him to "90 days in jail, which he's already served" on his obstructing count. In its

sentencing entry, however, the court sentenced him to 90 days in jail. Its entry did not indicate that those 90 days had already been served. Nor did it indicate that the 90-day sentence would run consecutively or concurrently with Mosley's remaining sentence. The sentencing entry is silent regarding the service of the 90-day sentence.

{¶67} This Court rejects Mosley's argument that his obstructing count "should be discharged for time served." By operation of law, the 90-day jail sentence that the court imposed on that misdemeanor count will run concurrently with his felony sentence. *See* R.C. 2929.41(A). Moreover, Mosley received 373 days of jail-time credit. Any error the court committed in not overtly indicating, in its sentencing entry, that Mosley's 90-day sentence had been satisfied by virtue of his jail-time credit was harmless. *See* Crim.R. 52(A).

Repeat Violent Offender Determination

{¶68} When an indictment includes a repeat violent offender specification, "[t]he court shall determine the issue of whether an offender is a repeat violent offender." R.C. 2941.149(B). *See also State v. Hunter*, 123 Ohio St.3d 164, 2009-Ohio-4147, ¶ 34-40. Relevant to this appeal, a person is a repeat violent offender if (1) he is being sentenced for committing "any felony of the first or second degree that is an offense of violence * * *"; and (2) he "previously was convicted of or pleaded guilty to [that same type of ] offense * * *." R.C. 2929.01(CC)(1)-(2). When an offender has been convicted of a repeat violent offender specification under R.C. 2941.149, he may be subject to an enhanced penalty. *See* Former R.C. 2929.14(B)(2). In addition to sentencing him to "the longest prison term authorized" for his offense, a court must impose "an additional definite prison term" of between one to ten years upon him if both of the following criteria apply:

> (ii) The offender within the preceding twenty years has been convicted of or pleaded guilty to three or more offenses described in [R.C. 2929.01(CC)(1)], including all offenses described in that division of which the offender is convicted

* * * in the current prosecution and all offenses described in that division of which the offender previously has been convicted * * *.

(iii) The offense or offenses of which the offender currently is convicted * * * is * * * any felony of the first degree that is an offense of violence and the court does not impose a sentence of life imprisonment without parole * * *.

Former R.C. 2929.14(B)(2)(b)(i)-(iii).

{¶69} Following the jury's verdicts, the trial court held a hearing on Mosley's repeat violent offender specifications. The State presented testimony at the hearing and introduced certified copies of Mosley's prior convictions in two separate cases. The testimony and certified judgment entries evidenced that Mosley had (1) a 2007 conviction for second-degree felony robbery, and (2) a 2012 conviction for second-degree felonious assault with a repeat violent offender specification. The trial court determined, based on Mosley's prior convictions and his convictions in the instant appeal, that Mosley was a repeat violent offender and was subject to an enhanced penalty.

{¶70} Mosley argues that the trial court erred when it found that he was subject to an enhanced penalty as a repeat violent offender. First, he argues that R.C. 2941.149(B) is unconstitutional because it permits trial courts to usurp the role of the jury and impose additional penalties based on judicial fact-finding. He acknowledges that the Ohio Supreme Court has rejected this argument, *see Hunter*, 123 Ohio St.3d 164, 2009-Ohio-4147, ¶ 34-40, but indicates that he has raised it "to preserve further review." Next, he argues that the State set forth insufficient evidence in support of his penalty enhancement as a repeat violent offender. He claims that, at best, the State proved he had two prior, qualifying convictions. According to Mosley, the court could not rely on his current convictions as qualifying convictions.

{¶71} To the extent Mosley challenges the constitutionality of R.C. 2941.149(B) and its related statutory scheme, the record reflects that he never raised that argument in the lower court.

"The failure to raise a constitutional issue at the trial level [forfeits] the right to advance a constitutional argument at the appellate level." *State v. McGinnis*, 9th Dist. Medina No. 05CA0061-M, 2006-Ohio-2281, ¶ 29. "While a defendant who forfeits such an argument still may argue plain error on appeal, this [C]ourt will not sua sponte undertake a plain-error analysis if a defendant fails to do so." *State v. Cross*, 9th Dist. Summit No. 25487, 2011-Ohio-3250, ¶ 41, citing *State v. Hairston*, 9th Dist. Lorain No. 05CA008768, 2006-Ohio-4925, ¶ 11. "Because [Mosley] forfeited this issue on appeal and has not argued plain error, we must conclude that [his argument] lacks merit." *Id.* at ¶ 42.

{¶72} Likewise, we reject Mosley's argument that the State failed to prove that he had three or more qualifying convictions within the preceding twenty years. *See* Former R.C. 2929.14(B)(2)(ii). The State set forth evidence that he had two prior convictions, both of which were felonies of the second-degree and both of which were offenses of violence. The State, therefore, only needed to prove that he had been convicted of one additional, qualifying felony. Former R.C. 2929.14(B)(2)(ii) specifically instructed courts to include in its penalty enhancement determination "all offenses described in [R.C. 2929.01(CC)(1)] of which the offender is convicted * * * *in the current prosecution* * * *." (Emphasis added.) Mosley was convicted of multiple felonies in the instant prosecution, several of which were first-degree felony offenses of violence. The court, therefore, did not err when it found that he was subject to a penalty enhancement. *See* Former R.C. 2929.14(B)(2)(ii). *Accord State v. Brown*, 10th Dist. Franklin Nos. 10AP-836, 10AP-845, 2011-Ohio-3159, ¶ 23. Mosley's fifth assignment of error is overruled.

## Assignment of Error VI

**The convictions and sentences are contrary to law in violation of Ohio's Constitution and Amendments to the United States Constitution due to prejudicial and plain errors of denial of the effective assistance of trial counsel.**

**{¶73}** In his sixth assignment of error, Mosley argues that he received ineffective assistance of counsel. We disagree.

**{¶74}** To establish ineffective assistance of counsel, a defendant must demonstrate (1) that counsel's performance was deficient, in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). This Court "need not address both prongs of the *Strickland* test should it find that [Mosley] failed to prove either." *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

Jury Instructions

**{¶75}** Mosley argues that he received ineffective assistance of counsel because his attorneys failed to object when the trial court incorrectly instructed the jury on the State's burden of proof. His argument pertains to the court's instruction that a not guilty verdict is appropriate only if the State fails to prove "all the essential elements" of an offense beyond a reasonable doubt. *See* Discussion of Assignment of Error I, *supra*. Mosley claims that the court's instruction amounted to both plain and structural error, so his attorneys ought to have objected.

{¶76} We have already determined that the trial court did not commit either plain or structural error when it instructed the jury on the requirements for a not guilty verdict. *See id.* Its instructions were accurate as a whole, and the evidence against Mosley was compelling. Because Mosley has not demonstrated that the result in this matter would have been different if not for the court's single erroneous instruction, we reject his argument that he was prejudiced by his attorneys' failure to object. *See Bradley* at paragraph three of the syllabus.

DNA Evidence

{¶77} Next, Mosley argues that he received ineffective assistance of counsel when his attorneys failed to (1) object to the State's arguments about the DNA evidence, (2) object to the State's disclosure of certain aspects of the DNA evidence on the third day of trial, and (3) refute the State's evidence through either reasonable cross-examination or expert testimony. He claims that the prosecutor overstated the statistical significance of the DNA evidence in this case while denigrating defense counsel's use of "attorney math." Because the DNA evidence was the lynchpin of the State's case, Mosley argues, he was prejudiced by his attorneys' failure to combat that evidence and the State's arguments.

{¶78} This Court outlined the State's DNA evidence in our discussion of Mosley's second and third assignments of error. In doing so, we concluded that the State did not engage in misconduct in fashioning its theme and argument regarding that evidence. *See* Discussion of Assignment of Error II, *supra*. Mosley's attorneys may well have determined that any objections they made to the State's arguments were unlikely to succeed and more likely to highlight the damning nature of the DNA evidence. *See State v. Smith*, 9th Dist. Wayne No. 12CA0060, 2013-Ohio-3868, 2013 WL 4816879, ¶ 24, quoting *State v. Guenther*, 9th Dist. Lorain No. 05CA008663, 2006-Ohio-767, 2006 WL 401309, ¶ 74 ("This Court has consistently held that trial counsel's

failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel."). Likewise, they may have thought it wise to rely on cross-examination rather than call a defense expert who would be subject to the State's examination. *See State v. Spaulding*, 9th Dist. Summit No. 28526, 2018-Ohio-3663, ¶ 55 ("An attorney's reliance on cross-examination in lieu of calling an expert to testify at trial is a legitimate, tactical decision and does not constitute ineffective assistance of counsel."). Because both decisions were matters of trial strategy, they do not establish ineffective assistance of counsel. *See Smith* at ¶ 24; *Spaulding* at ¶ 55.

{¶79} To the extent Mosley claims that his attorneys ought to have objected when the prosecutor accused them of "attorney math" in closing argument, he has not shown that their failure to do so affected the outcome of his trial. *See Bradley*, 42 Ohio St.3d 136, at paragraph three of the syllabus. Nor has he demonstrated ineffective assistance of counsel based on their failure to object to the State's disclosure of certain DNA evidence on the third day of trial. Mosley cites a brief passage from the transcript, during which the prosecutor mentioned a "recent swab that was * * * looked at by both analysts" and "around 75 pages that were sent to [defense counsel] for the data and analysis * * *." It is entirely unclear from the record, however, what that swab entailed or whether the State ultimately introduced that evidence at trial. The BCI analysts who testified at trial only testified to their reports, the last of which was completed ten months before the start of trial. Because Mosley has not shown that the State introduced evidence about a more "recent swab" at trial, he cannot demonstrate prejudice as a result of his attorneys' failure to object to the State's disclosure of that evidence. *See id.*

Right to Testify

**{¶80}** Mosley also argues that he received ineffective assistance of counsel because his attorneys never advised him that he had a right to testify. Yet, he has not cited any portion of the record in support of his argument. *See* App.R. 16(A)(7). "Allegations of ineffective assistance of counsel that rely on evidence outside of the record are impossible to resolve on direct appeal." *State v. Dukes*, 9th Dist. Summit No. 27966, 2019-Ohio-2893, ¶ 39. Because this Court cannot determine Mosley's claim on the basis of the record before us, we reject his argument regarding his attorneys' failure to advise him of his right to testify. *See id.*; *State v. Beaver*, 9th Dist. Medina No. 18CA0055-M, 2019-Ohio-3411, ¶ 5.

Suppression of Evidence

**{¶81}** Finally, Mosley argues that he received ineffective assistance of counsel because his attorneys did not move to suppress (1) derivative evidence that the police obtained as the result of an unlawful interrogation, and (2) the photo array identifications. We consider each argument in turn.

**{¶82}** Mosley was represented by two different attorneys before those attorneys withdrew and a third attorney (and later co-counsel) was appointed. His former attorney filed a motion to suppress statements that Mosley made at the police station on the day of his arrest because they were obtained after he invoked his right to counsel. The State conceded the error, and his statements were suppressed. Even so, Mosley argues that his new attorneys also should have moved to suppress the "derivative physical evidence" that the police obtained during his unlawful interrogation (i.e., his photograph, fingerprints, and DNA). Because they did not, he argues, he received ineffective assistance of counsel.

**{¶83}** Upon review, Mosley has not shown that he would have succeeded upon a motion to suppress physical evidence the police obtained during his interrogation. The exclusionary rule only acts "'to exclude evidence that flows from, and is the result of, the violation of a person's constitutional rights.'" *State v. Graves*, 9th Dist. Medina No. 13CA0068-M, 2014-Ohio-5477, ¶ 12, quoting *State v. Hobbs*, 9th Dist. Summit No. 25379, 2011-Ohio-3192, ¶ 18. "The rule does not prohibit the admission of evidence that 'has been discovered by means entirely independent of any constitutional violation.'" *State v. Bryner*, 9th Dist. Lorain No. 18CA011257, 2018-Ohio-3215, ¶ 17, quoting *State v. Perkins*, 18 Ohio St.3d 193, 194 (1985). The record reflects that officers had a warrant for Mosley's arrest. His photograph, fingerprints, and DNA were obtained as a result of his lawful arrest. Because that evidence did not flow from the violation of his right to consult with an attorney, Mosley has not shown that a motion to suppress that evidence would have been successful. *See Bradley*, 42 Ohio St.3d 136, at paragraph three of the syllabus.

**{¶84}** With regard to the photo array identifications, Mosley argues the entire procedure was tainted because T.C. first identified him based on a "one on one photo." He claims that his attorneys should have moved to suppress the girls' identifications because his photo was chosen based on T.C.'s identification, which was inherently suggestive. Yet, the record reflects that it was T.C.'s mother who first showed Mosley's picture to T.C. Her "one on one" identification was not a product of state action. *See State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 209 ("When the questionable circumstances of an identification procedure are not due to state action, the reliability of the identification is a question going to the weight of the testimony, not its admissibility."). Moreover, officers testified in detail about the procedures they followed when compiling an array and conducting a blind administration so as to guard against a biased or suggestive identification. Mosley has not shown that there exists a reasonable probability that,

had his attorneys moved to suppress the identifications, their motion would have been successful. *See State v. Atkinson*, 9th Dist. Lorain No. 19CA011466, 2020-Ohio-315, ¶ 16. Accordingly, his sixth assignment of error is overruled.

III.

**{¶85}** Mosley's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

CALLAHAN, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

MARK H. LUDWIG, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and ANDREA D. UHLER, Assistant Prosecuting Attorney, for Appellee.